# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **CODY NELSON HORTON,** ) | |
| Plaintiff ) | |
| v. ) | Civil Action No. 2:16cv00020 |
| ) | **MEMORANDUM OPINION** |
| **NANCY A. BERRYHILL,**[1] ) | |
| **Acting Commissioner of** ) | |
| **Social Security,** ) | |
| Defendant ) | By: PAMELA MEADE SARGENT |
| ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Cody Nelson Horton, ("Horton"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for child's insurance benefits based on disability, ("CDIB"), and supplemental security income, ("SSI"), benefits under Title XVI of the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 402(d), 1381-1383d. (West 2011 & West 2012 & Supp. 2017). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

-1-

through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Horton protectively filed his applications for CDIB and SSI[2] on December 5, 2011, alleging disability as of October 15, 2011, due to scoliosis, club foot, cleft palate and learning difficulties. (Record, ("R."), at 224-27, 234-35, 247, 251.) The claims were denied initially and upon reconsideration. (R. at 121-23, 127-29, 132-34, 138-40, 143-44, 146, 148-50, 152-57, 159-61.) Horton then requested a hearing before an ALJ. (R. at 162-63, 183-84.) The ALJ held a video hearing on February 23, 2015, at which Horton was represented by counsel. (R. at 28-58.)

By decision dated March 31, 2015, the ALJ denied Horton's claims. (R. at 13-23.) The ALJ found that Horton was born in 1992, and, therefore, had not

---

[2] Horton filed initial applications for CDIB and SSI on October 22, 2009, and August 21, 2010, alleging disability beginning in January 1992, on the date of his birth. (R. at 62.) The claims were denied initially and upon reconsideration. (R. at 62.) Horton then requested a hearing before an administrative law judge, ("ALJ"), and a video hearing was held on October 12, 2011. (R. at 62.) Horton was not represented by counsel at this hearing. (R. at 62.) By decision dated October 14, 2011, the ALJ denied Horton's claims. (R. at 62-69.) I find that the prior 2011 decision is res judicata with regard to the period before October 14, 2011. In the 2015 decision, the ALJ noted that he reviewed the previous ALJ's October 14, 2011, decision. (R. at 13.)

attained age 22 as of October 15, 2011, the alleged onset date. (R. at 16.) The ALJ found that Horton had not performed any substantial gainful activity since October 15, 2011, the alleged onset date. (R. at 16.) The ALJ found that the medical evidence established that Horton suffered from severe impairments, namely scoliosis; bilateral club foot; obesity; Perthes disease[3] of the right hip; diabetes mellitus; high blood pressure; and status-post back surgery with rod placement, but he found that Horton did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16.) The ALJ found that Horton had the residual functional capacity to perform sedentary work[4] that did not require kneeling, crawling or climbing; that allowed for occasional stooping and crouching; that allowed him to alternately sit and stand at his workstation one to two times between scheduled breaks for a few minutes each time; that allowed only frequent handling and fingering; and that allowed the use of a cane to ambulate 100 feet or more. (R. at 17.) The ALJ stated that he gave the 2011 residual functional capacity assessment limiting Horton to light work some weight to the extent the findings of Horton's physical limitations and restrictions were somewhat more restrictive than was determined. (R. at 13.) The ALJ found that new and material evidence supported the additional limitations as found in the 2015 decision. (R. at 13.) The ALJ found that Horton had no past relevant work. (R. at 21.) Based on Horton's age, education, work history and residual functional capacity and

---

[3] Perthes disease is defined as osteochondrosis localized in the upper end of the femur. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 588, 627 (1995).

[4] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§404.1567(a), 416.967(a) (2017).

the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Horton could perform, including jobs as an assembler, a cuff folder and a weight tester. (R. at 21-22.) Therefore, the ALJ concluded that Horton was not under a disability as defined by the Act and was not eligible for CDIB or SSI benefits. (R. at 22-23.) *See* 20 C.F.R. §§ 404.350(a)(5), 404.1520(g), 416.920(g) (2017); *see also* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) .

After the ALJ issued his decision, Horton pursued his administrative appeals, (R. at 8-9), but the Appeals Council denied his request for review. (R. at 1-5.) Horton then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2017). The case is before this court on Horton's motion for summary judgment filed January 20, 2017, and the Commissioner's motion for summary judgment filed March 16, 2017.

## II. Facts

Horton was born in 1992, (R. at 224, 234), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education and no past work experience. (R. at 252.) He reported that he did not attend special education classes. (R. at 252.) Horton stated that he received disability benefits as a child, but the benefits ceased when he attained age 18. (R. at 36-37, 77.) He stated that he watched movies and read books. (R. at 37.) Horton stated that he helped dust "a little bit," but his father performed the remaining household duties. (R. at 37-38.) He stated that he had attempted to obtain his driver's license on three occasions, but failed the test each time. (R. at 38.) Horton stated that he had trouble understanding

and reading the test. (R. at 50.) He stated that he took over-the-counter ibuprofen for his pain because he had no insurance to purchase prescription pain medication. (R. at 38.) He stated that he was unable to lift items from a table in front of him that weighed more than 15 pounds; bend and lift items from the floor that weighed more than 10 pounds; walk more than 25 minutes without a cane; stand more than 15 minutes without interruption; or sit more than 20 minutes without interruption. (R. at 39, 41, 44.) Horton stated that he occasionally walked for exercise. (R. at 39.) He stated that he used a cane to help ease the pain on his right side. (R. at 40.)

Asheley Wells, a vocational expert, was present and testified at Horton's hearing. (R. at 53-57.) Wells was asked to consider a hypothetical individual who was in the age group of late teens to age 23, who had a high school education and no work history, who was limited to sedentary work that did not require kneeling, crawling or climbing, that did not require more than occasional stooping or crouching, that did not require more than frequent bilateral handling and fingering and that allowed the individual to alternate between sitting and standing, giving the individual the opportunity to do so at their workstation one to two times between scheduled breaks. (R. at 53.) Wells stated that the individual could perform jobs that were available existing in significant numbers in the national economy, including those of an assembler, a cuff folder and a weight tester. (R. at 53-54.) Wells stated that the individual could do these jobs should he be required to use a cane or assistive device to ambulate more than 100 feet. (R. at 54.)

Wells was asked to consider the same individual, but who would be limited as indicated by Dr. Michael's assessment. (R. at 54.) In particular, Wells was asked to consider an individual who could stand and walk for less than two hours in an

eight-hour workday, sit for at least six hours in an eight-hour workday and occasionally lift items weighing up to 10 pounds. (R. at 54.) She stated that, although the jobs cited did not require very much walking, all competitive employment would be precluded if the number of work hours totaled less than eight hours. (R. at 54-55.) She stated that, if the person could sit for up to eight hours, he could perform the previously identified jobs. (R. at 55.) Wells stated that the jobs cited required frequent lifting and handling of objects that did not weigh much and allowed a sit/stand option at the individual's work station. (R. at 55-56.) She stated that there would be no jobs available that such an individual could perform should he be incapable of maintaining concentration to perform simple tasks. (R. at 56-57.)

In rendering his decision, the ALJ reviewed records from Stephen P. Saxby, Ph.D., a state agency psychologist; Dr. Lewis Singer, M.D., a state agency physician; Jeanne Buyck, Ph.D., a state agency psychologist; Dr. J. Astruc, M.D., a state agency physician; Dr. Kevin Blackwell, D.O.; Dr. Gary E. Michael, M.D.; Shriners Hospitals for Children; Holston Medical Group; Clinch River Health Services, Inc.; and Dr. Ashok V. Mehta, M.D. Horton's attorney also submitted additional medical records from Clinch River Health Services to the Appeals Council.[5]

The record shows that Horton was admitted to the Shriners Hospitals for Children for bilateral postero-medial releases; bilateral ankle medial malleolar

---

[5] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-5), this court must also take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

screw placement; a spinal fusion; and removal of medial malleolar hardware from both ankles resulting from club foot and scoliosis. (R. at 415-23.) In October 2007, x-rays of Horton's pelvis showed mild flattening of the femoral heads bilaterally; residual previous Legg-Perthes disease; the femoral heads were directed towards the socket of the hipbone bilaterally; and no evidence of acute abnormality. (R. at 425.) X-rays of Horton's thoracolumbar spine showed hardware present, intact and without evidence for complication. (R. at 426.) X-rays of Horton's ankles showed irregularity of the talar dome,[6] particularly on the left, and several degrees of ankle valgus on the left. (R. at 424.) In October 2009, Horton complained of bilateral hip pain and low back pain. (R. at 406, 410.) It was noted that Horton ambulated with a reciprocating heel-to-toe gait with a fat-thigh type gait. (R. at 406.) Horton had approximately 20 to 30 degrees of external foot progression. (R. at 406.) On examination, Horton's left hip had virtually no internal rotation and approximately 30 degrees of external rotation with fairly good abduction. (R. at 406.) He reported that his pain was "fairly tolerable." (R. at 406.)

On November 18, 2007, Dr. Kevin Blackwell, D.O., examined Horton at the request of Disability Determination Services. (R. at 300-04.) Horton reported that he had difficulty "keeping up with his gait," which caused him to stumble and, at times, fall. (R. at 301.) Horton stated that he did well at school educationally. (R. at 301-02.) Dr. Blackwell noted that Horton's gait was unsteady, and he walked with everted ankles. (R. at 303.) Horton's back was tender along the paraspinal muscles with no muscle spasm. (R. at 303.) Dr. Blackwell diagnosed cleft palate deformity;

---

[6] A talar dome lesion is an injury to the cartilage and underlying bone of the talus within the ankle joint. It is also called an osteochondral defect or osteochondral lesion of the talus. *See* Foot Health Facts, *Talar Dome Lesion*, https://www.foothealthfacts.org/conditions/talar-dome-lesion (last visited Oct. 5, 2017).

foot deformity, club feet status-post surgery; history of scoliosis; and elevated blood pressure. (R. at 303.) Dr. Blackwell opined that Horton could stand for up to two hours in an eight-hour workday with normal positional changes; sit for up to eight hours in an eight-hour workday with normal positional changes; he could not squat, kneel, crawl, climb ladders or stairs or perform repetitive foot activities; he could lift items weighing up to 35 pounds and frequently lift items weighing up to 10 pounds; he had no limitations of hand usage or above head reaching; and he could bend and stoop up to one-third of the day. (R. at 304.)

The record shows that Horton received treatment from Clinch River Health Services, Inc., ("Clinch River"), from October 2011 to April 2015 for diabetes mellitus, type II; hyperlipidemia; muscle spasm; dentition; bronchitis; sinusitis; upper respiratory infection; low back pain; allergic rhinitis; croup; acute bronchospasm; and bilateral carpal tunnel syndrome. (R. at 324-46, 429-36, 445-69, 472-502, 505.) During this time, Horton reported that he occasionally exercised, and diet and exercise counseling was provided. (R. at 330, 332-34, 336, 339, 344-45, 454-55, 458, 461, 463, 466, 478, 480, 482, 484, 487, 489, 492.) Examinations showed right lumbar spasm, neck spasm and tenderness and a trace of edema. (R. at 328, 452, 455, 459, 467, 474, 478, 481, 485, 493.) On various office visits, the lower extremity amputation prevention, ("LEAP"), test was performed, which showed no foot ulcers; abnormal shape; toe deformity; swelling; or muscle weakness. (R. at 331, 342, 430, 452, 478.) However, in September 2014, Dr. Gary E. Michael, M.D., a physician with Clinch River, noted that examination of Horton's feet showed a toe deformity. (R. at 455, 481.)

On May 3, 2014, Dr. Michael completed a Physical Residual Functional

Capacity Questionnaire, indicating that Horton had a diagnosis of right-sided Perthes disease; scoliosis with posterior spinal fusion; bilateral club foot status-post postero-medial release; bilateral ankle valgus with medial malleolar screws; and diabetes. (R. at 437-41.) He stated Horton had limited range of motion of his back, hip and ankles. (R. at 437.) Dr. Michael reported that emotional factors did not contribute to the severity of Horton's symptoms and functional limitations. (R. at 438.) He reported that Horton's pain and other symptoms were severe enough to frequently interfere with his ability for attention and concentration needed to perform simple work tasks. (R. at 438.) Dr. Michael reported that Horton could tolerate only low-stress jobs. (R. at 438.) He opined that Horton was capable of walking less than one city block without rest or severe pain; that he could sit for up to six hours in an eight-hour workday and that he could do so for up to two hours without interruption; that he could stand for up to 30 minutes without interruption; that he could stand and/or walk less than two hours in an eight-hour workday; that he would need to have the ability to walk every 90 minutes for up to 10 minutes; and that he needed a job that allowed him to shift positions at will from sitting, standing or walking. (R. at 438-39.) He reported that Horton did not need to take unscheduled breaks; did not need to elevate his legs with prolonged sitting; and did not need to use a cane or other assistive device. (R. at 439.) Dr. Michael opined that Horton could rarely lift and carry items weighing 20 pounds and occasionally lift and carry items weighing up to 10 pounds. (R. at 439.) He found that Horton could occasionally look down, turn his head right or left, look up and hold his head in a static position; occasionally stoop and climb stairs; rarely twist, crouch or squat; and never climb ladders. (R. at 440.) Dr. Michael noted that Horton had no limitations with reaching, handling or fingering. (R. at 440.)

In September 2014, an x-ray of Horton's lumbar spine showed moderate to severe scoliosis of the thoracolumbar spine; multiple vertebral body anomalies about the thoraco-lumbar junction were present; disc space narrowing at the L3-L4 and L4-L5 levels; spondylotic spur formation throughout the lumbar spine, most prominent on the right at L4-L5; and spinal fixation involving thoracolumbar scoliosis was noted. (R. at 443.) In April 2015, Horton complained of paresthesias in his hands and tingling in his right hand. (R. at 473.) Horton had a positive Tinel's sign and Phalen's sign, the right greater than the left. (R. at 474.) Dr. Michael diagnosed bilateral carpal tunnel syndrome. (R. at 475.) Dr. Michael instructed Horton to avoid repetitive motions and strains across his wrists and hands. (R. at 475.)

On September 19, 2013, Stephen P. Saxby, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that record did not establish a mental impairment. (R. at 78-79.) Saxby noted that Horton alleged that he was a "slow learner," but the record failed to show a diagnosis or past medical history or any incidental evidence of any learning impairment. (R. at 78.) It was noted that Horton had adequate social functioning and no severe symptoms of depression, such as crying spells or avoiding others. (R. at 78.)

On September 19, 2013, Dr. Lewis Singer, M.D., a state agency physician, opined that Horton had the residual functional capacity to occasionally lift and carry items weighing 20 pounds and frequently lift and carry items weighing 10 pounds, stand and/or walk four hours in an eight-hour workday and sit up to six hours in an eight-hour workday. (R. at 80.) He found that Horton was limited in his ability to

push and pull with both lower extremities. (R. at 80.) Dr. Singer found that Horton could occasionally use foot controls. (R. at 80.) He found that Horton could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 80-81.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 81.)

On November 7, 2013, Jeanne Buyck, Ph.D., a state agency psychologist, completed a PRTF, indicating that the record did not establish a mental impairment. (R. at 101.) Buyck noted that Horton alleged that he was a "slow learner," but the record failed to show a diagnosis or past medical history or any incidental evidence of any learning impairment. (R. at 101.) It was noted that Horton had adequate social functioning and no severe symptoms of depression, such as crying spells or avoiding others. (R. at 101.)

On November 8, 2013, Dr. J. Astruc, M.D., a state agency physician, opined that Horton had the residual functional capacity to occasionally lift and carry items weighing 20 pounds and frequently lift and carry items weighing 10 pounds, stand and/or walk two hours in an eight-hour workday and sit up to six hours in an eight-hour workday. (R. at 102-04.) He found that Horton was limited in his ability to push and pull with both lower extremities. (R. at 103.) Dr. Astruc found that Horton could occasionally use foot controls. (R. at 103.) He found that Horton could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 103.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 103.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2017). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2017).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

In his brief, Horton argues that the ALJ failed to properly evaluate the opinion of his treating physician, Dr. Michael. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-10.) Horton also argues that the ALJ

failed to properly and fully consider the previous ALJ's decision dated October 14, 2011. (Plaintiff's Brief at 10-12.) In particular, Horton argues that the ALJ failed to address the evidence that supported an improvement in his ability to sit. (Plaintiff's Brief at 11.)

Horton argues that the ALJ erred by failing to properly evaluate the opinion of his treating physician, Dr. Michael, and that he failed to properly and fully consider the previous ALJ's decision. (Plaintiff's Brief at 6-12.) It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings. Based on my review of the record, I do not find that substantial evidence exists to support the ALJ's weighing of the evidence, nor do I find that the ALJ gave appropriate weight to the previous ALJ's decision as required by Social Security Acquiescence Ruling 00-1(4), ("AR 00-1(4)").

The ALJ stated that he was giving Dr. Michael's opinion "some weight insofar as it generally reflects some deterioration as of the date of his assessment." (R. at 20.) The ALJ also noted that Dr. Michael's treatment notes did not fully reflect such worsening. (R. at 20.) The record shows that in 2004 and 2005 Horton had bilateral postero-medial releases; bilateral ankle medial malleolar screw placement; a spinal fusion; and removal of medial malleolar hardware from both ankles

resulting from club foot and scoliosis. (R. at 353-54, 359, 415-23.) In 2007, x-rays of Horton's ankles showed irregularity of the talar domes and several degrees of ankle valgus on the left. (R. at 424.) X-rays of Horton's pelvis showed mild flattening of the femoral heads bilaterally. (R. at 425.) Dr. Blackwell noted in 2007 that Horton's gait was unsteady, and he walked with everted ankles. (R. at 303.) He found that Horton could not perform repetitive foot activities. (R. at 304.)

In 2013, the state agency physicians found that Horton had the residual functional capacity to perform light work with postural limitations. (R. at 80-81, 102-03.) The state agency physicians also found that Horton was limited in his ability to push and pull with both lower extremities, which allowed for only occasional use of foot controls. (R. at 80, 103.) The ALJ noted in his decision that the state agency physicians found that Horton could perform a "range of sedentary exertional work with occasional postural limitations." (R. at 20.) The ALJ stated that he was giving "some weight" to the state agency physicians' opinions to the "extent the claimant is limited to sedentary work." (R. at 20.) The ALJ failed to mention the additional limitation on Horton's ability to push and pull with both lower extremities. (R. at 20.)

In the ALJ's prior decision, the ALJ found that Horton could not stand or walk for more than six hours in an eight-hour workday; sit more than two hours of an eight-hour workday; could not perform more than frequent operation of bilateral foot controls; only occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolding; could only occasionally balance, stoop, kneel, crouch or crawl; could only frequently reach overhead or bilaterally handle or feel; and could not work around unprotected heights or dangerous machinery. (R. at 66.)

In accordance with AR 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim." *See also Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999).

The ALJ in this case noted that he reviewed the previous ALJ's October 14, 2011, decision. (R. at 13.) The ALJ stated that he gave the residual functional capacity assessment, limiting Horton to light work, some weight to the extent the findings of Horton's physical limitations and restrictions were somewhat more restrictive than was determined. (R. at 13.) The ALJ found that new and material evidence supported the additional limitations as found in the 2015 decision. (R. at 13.) While a step-by-step explanation is not required for an ALJ to comply with AR 00-1(4), an ALJ's written decision must provide an explanation for discrediting or failing to adopt past administrative findings favorable to the claimant. *See Grant v. Colvin*, 2014 WL 852080, at *7 (E.D. Va. Mar. 4, 2014). The ALJ has a duty to resolve conflicts within the record and provide the claimant with a justification for the resolution. *See Kasey v. Sullivan*, 3 F.3d 75, 79 (4th Cir. 1993). Since the ALJ

failed to mention the discrepancy in Horton's ability to sit and the limitations identified on his ability to use his bilateral lower extremities, I cannot find that substantial evidence exists to support the ALJ's residual functional capacity finding.

As noted above, the ALJ also failed to mention the limitation on Horton's ability to push and pull with both lower extremities found by the state agency physicians, nor did he mention Dr. Blackwell's finding that Horton could not perform repetitive foot activities. It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Thus, I do not find that substantial evidence exists to support the ALJ's finding with regard to Horton's residual functional capacity.

Therefore, I also find that substantial evidence does not exist in the record to support the ALJ's decision that Horton was not disabled. An appropriate Order and Judgment will be entered remanding this case to the Commissioner for further

consideration.

DATED: October 5, 2017.

*s/ Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE